UNITED STATES of America

v.

Jose Luis AGUILAR–ESPINOSA.

No. 97–371–CR–T–23B.

United States District Court,
M.D. Florida,
Tampa Division.

June 30, 1999.

Ronald J. Tenpas, United States Attorney's Office, Tampa, FL, for plaintiffs.

Arthur N. Eggers, Tampa, FL, for defendants.

### ORDER

MERRYDAY, District Judge.

The defendant interposes a motion to withdraw his pleas of guilty with respect to both counts of an indictment charging him (1) under Section 5845(b) of Title 26 and Section 922(*o*) of Title 18 of the United States Code with possession of a machine gun and (2) under Section 922(k) of Title 18 of the United States Code with possession of a firearm with an obliterated, altered, or removed serial number.

#### 1. *Withdrawal of a Plea*

Both the United States and the defendant agree without hesitation that four factors govern the defendant's ability to withdraw his plea of guilty: (1) whether the defendant enjoyed "close assistance of [effective] counsel" at the rearraignment, (2) whether the defendant's plea was knowing and voluntary, (3) whether judicial resources will dissipate unjustifiably if the plea is withdrawn, and (4) whether the government is unduly or unreasonably prejudiced or disadvantaged if the burden of proof is revisited upon the prosecution after the passage of time since the rearraignment. *United States v. Buckles*, 843 F.2d 469 (11th Cir.1988), *cert denied*, 490 U.S. 1099, 109 S.Ct. 2450, 104 L.Ed.2d 1005 (1989); *United States v. Gonzalez–Mercado*, 808 F.2d 796 (11th Cir.1987).

A plea of guilty without the assistance of counsel, although permissible within the confines of *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and similar cases, is disfavored and entitled to less deference than a guilty plea proffered with the effective assistance of counsel. However, this case presents no issue as to the assistance of counsel because the defendant was represented at the rearraignment by an experienced and capable defense counsel who is a stranger neither to this court nor to this genre of proceeding (and who fluently speaks Spanish, the first language of both the defendant and the interpreter who assisted the defendant and his counsel at all stages of this proceeding, including in the review of the plea agreement before it was signed).

The principled administration of justice requires that an unknowing and involuntary plea of guilty is voidable without particular regard to any modest inconvenience to the court, the prosecution, and the witnesses. This case presents no material issue respecting either prejudice to the United States in its prosecutorial effort or prejudice to the judiciary based on the prospect of reviving a dispute that has otherwise satisfactorily resolved itself through the entry of a guilty plea. Although a measure of delay accompanied by the usual complications (e.g., more remote witness recollections, increased difficulty in summoning the necessary physical and documentary evidence, and the replication of prosecutorial effort) is implicit in this matter, nothing appears that rises above the ordinary and readily anticipated dislocations, which if given controlling effect would preclude the withdrawal of a guilty plea in all but the most acute and intolerable episodes of overreaching, mistake, or omission. As most graphically suggested in the instance of legislatively sponsored statutes of limitation and repose, delay typically inures to the detriment of the party that bears the burden of proof—in criminal cases, obviously, the prosecution. However, this case offers to neither participant any discernible tactical or strategic advantage arising from the vagaries attendant to delay.

The most palpable consequence of permitting withdrawal of the plea in this instance is to avail the defendant of a chance, gained after he has secured eigh-

teen months of delay by undertaking to cooperate with the prosecution in the manner contemplated by Section 5K1.1 of the United States Sentencing Guidelines, to again challenge the inevitability of a prison sentence by trial before a jury. This inures to the defendant's benefit particularly because the United States Attorney has declined to seek mitigation or abrogation of the defendant's sentence, his fitful efforts at cooperation notwithstanding. The defendant's propensity to abscond rather than to persistently cooperate undoubtedly somewhat alienates the prosecutor in that regard. In any event, neither the cause nor the consequence of the delay weighs heavily against withdrawal of the plea in this instance.

### 2. The Meaning of Section 5845(b)

Section 922(o) of Title 18 states that "it shall be unlawful for any person to transfer or possess a machine gun." This proscription is readily understandable, simply expressed, and absolute in tone. The principal residual issue is the identity of the particular items that constitute proscribed machine guns. Section 5845(b) defines a machine gun as:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

■ In short, the statute provides several alternative formulations. If a weapon shoots automatically, is designed to shoot automatically, or is readily restorable to shoot automatically, the weapon is a machine gun. These three alternatives are expressed disjunctively. Any weapon that qualifies under any one of the three concepts (shoots, designed to shoot, restorable to shoot) is a proscribed machine gun.[1]

The phrase "readily restored" lacks reassuring precision, but I assume "ready restoration" means a less than arduous assembly of manageable and available parts by a combination of (1) the ability of a reasonably skilled and informed but not necessarily expert or artistic worker and (2) tools commonly understood by and commonly available to such workers, including, for example, Allen wrenches, files, jeweler's screw drivers, and the like but excluding, for example, the resources available to a master machinist with a modern and well-equipped lathe. *S.W. Daniel, Inc. v. United States,* 831 F.2d 253 (11th Cir.1987); *United States v. Woods,* 560 F.2d 660 (5th Cir.), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978); *United States v. Woodlan,* 527 F.2d 608 (6th Cir.1976), *cert. denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976); *but see United States v. Smith,* 477 F.2d 399 (8th Cir.1973), which presses the notion of "ready restoration" near or beyond its distal boundary. The applicable test is the "readiness" of the restoration rather than its ultimate feasibility.

■ The intent of the "ready restoration" clause is, at least, to statutorily include a weapon that is inoperable as a fully automatic weapon on the occasion of the alleged unlawful possession but is capable of renewed automatic operation by the purposeful deployment of a practicable effort. On the other hand, the law is not intended to trap the unwary, innocent, and well-intentioned citizen who possesses an otherwise semi-automatic weapon that, by repeated use of the weapon, by the inevit-

---

1. Hence, the defendant's assertion in this case that, "A person must have knowledge the item 'can be readily restored to shoot automatically,'" is in error if the item is "designed to shoot ... automatically." The prosecution need prove only *one of the three* qualifying elements in the first sentence of Section 5845(b).

able wear and tear of sporting activities, or by means of mere inattention, happenstance, or ill-fortune, fires more than semi-automatically. Justice Thomas's helpful words in *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), remove any doubt as to the beneficence of the law's intended purpose—to avoid inadvertently ensnaring the innocent and to affirmatively capture the guilty. The border between one and the other has occasionally blurred.

▅▅ The statute continues with a second sentence and creates several additional categories of machine guns, including items which, but for the statutory definition, would not conform in isolation to the notion of a machine gun but which Congress obviously resolved to regulate carefully. Differently described, the statute creates a class of objects statutorily defined as a machine gun but which might not qualify as a machine gun as the term is commonly and typically understood. A "frame or receiver" and certain described parts of a weapon are included if critical or enabling to the assembly and operation of a machine gun.[2] Congress obviously intended to regulate possession of even an incipient machine gun, i.e., a device the possession of which is either tantamount to possessing a machine gun or the distinctive precursor of the automatic operation of a weapon. For example, a "sere" is, among other things, a small piece of machined metal with the precise configuration necessary to enable the automatic operation of certain weapons. This sere, which within the common notion is no gun at all (and certainly no machine gun), is a machine gun within the definition of the statute because of its enabling capability. A sere is no larger than ones finger; a sere will not fire a bullet; a sere is a statutory machine gun. One possesses a forbidden machine gun if one possesses a sere or any part or combination of parts that a knowledgeable person would recognize and appreciate as essential to the assembly and operation of a machine gun. In other words, Section 5845(b) includes in its definition both (1) a designed and manufactured automatic weapon and (2) parts and combinations of parts that, properly understood and utilized, result in a fully automatic weapon.

The second sentence of Section 5845(b) suggests definitively that Congress intended to the extent feasible to statutorily govern dispersement of the capacity to discharge weapons automatically. The capacity to initiate automatic weapons fire, although a capacity that is often subtly dispensed and inconspicuously harbored, is a brutally lethal capacity, the possession of which imminently threatens the public, whether appearing in the form of a shiny, newly manufactured, and complete weapon or in the form of one of those finely constructed and not widely understood parts that contribute decisively to the onset of automatic firing. Congress decided that the possessor of hardware bearing the capacity to enable automatic fire also possesses the hardware at considerable risk of criminal liability if the possessor knows the endangering nature of the goods possessed.

Plainly stated, the first sentence of Section 5845(b) merely states the obvious: an object is a prohibited machine gun if it fires automatically, if it is supposed to fire automatically, or if it will fire automatically in short order. Differently stated, the sentence states that an object is a prohibited machine gun if it works as a machine gun, if it is designed to work as a machine gun, or if it can work as a machine gun consequent upon the possessor's purposeful decision to work it. The first sentence, yet differently pressed, means that any weapon that is a machine gun in the ordi-

---

**2.** 27 C.F.R. § 179.11 defines a "frame or receiver" as:

  That part of a firearm which provides housing for the hammer, bolt or breechblock and firing mechanism, and which is usually threaded at its forward position to receive the barrel.

nary sense, absent any reference to the statute, is a machine gun for all purposes. Why the law should so speak is obvious. A machine gun is a machine gun, operable or not. The second sentence is directed at those who possess a distinctively enabling device and can bestow at will the capacity to shoot automatically. These devices may not be machine guns in the ordinary sense. A sere is not a machine gun in the ordinary sense; it is a statutory machine gun. Again, why the law should so speak is obvious. The incipient power of automatic firing is lethal and threatening. Both the first and second sentences of Section 5845(b) are essential links in the encompassing federal regulatory framework governing machine guns.[3]

### 3. *The Rearraignment Hearing and the Plea*

As presented by the defendant, this effort to withdraw the plea of guilty directly involves whether the plea was knowing and voluntary. The defendant argues that the plea dialogue between the magistrate judge and the defendant omitted the putatively necessary element of knowledge. The defendant contends that he lacked knowledge that the inoperable weapon he concededly possessed was readily susceptible to restoration and operation as a machine gun, i.e., a weapon that will continuously discharge projectiles upon a single depression of the trigger. The defendant unequivocally admitted during testimony at the rearraignment that the item he possessed was formerly an operable machine gun. However, in his effort to withdraw his plea, the defendant claims that his

testimony at the rearraignment failed to establish that he knew the weapon was readily restorable and could again function automatically if a sufficiently skilled workman restored its former attributes. Apparently, essential pieces were inoperable or missing from this weapon, which is quite old but not unavailable.

■ I assume the defendant's lack of knowledge of both the National Firearms Act and the requirements of registration and the like. However, the offense alleged against this defendant requires not that he know the requirements of the statute or even that he know the existence of the statute but, rather, that he know the facts that subject his acts and omissions to punishment by the statute. *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); *United States v. Owens*, 103 F.3d 953 (11th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 44, 139 L.Ed.2d 11 (1997); *United States v. Pearson*, 746 F.2d 787 (11th Cir.1984); *United States v. Sorrells*, 714 F.2d 1522 (11th Cir.1983). As stated in *Owens:*

> While *Staples* requires the government to prove a defendant's "[knowledge] of the features of (the weapon) that brought it within the scope of the Act," *id.*, it does not require that the government prove that a defendant knew that the firearm in his or her possession had to be registered under the Act. *Id.* at [511 U.S. at 608–09], 114 S.Ct. at 1798–99 (distinguishing *Staples* from *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), which held that where a defendant knows the items

---

**3.** In *United States v. Bailey*, 123 F.3d 1381, 1385, n. 3 (11th Cir.1997), the circuit court encapsulated that part of the framework governing machine guns:

> An automatic weapon, or a machinegun, is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger" 26 U.S.C. § 5845(b); *see* 27 C.F.R. § 178.11 .... It is a federal crime for anyone, including a licensed firearms dealer, to possess a machinegun unless (1) the

weapon is being transferred by a licensed dealer to a state or federal governmental agency, such as a police department, or (2) the weapon was manufactured and lawfully possessed prior to May 19, 1986, the effective date of the federal law banning possession of machineguns. *See* 18 U.S.C. § 922(*o*); 27 C.F.R. § 178.36; *Farmer v. Higgins*, 907 F.2d 1041, 1042–45 (11th Cir. 1990) (discussing § 922(*o*), its implementing regulations, and its effective date and corresponding "grandfather" clause).

he possessed had the features described in the statute (grenades there), the government need not prove that the defendant also knew they were unregistered); *see also id.* at [511 U.S. at 622] n. 3, 114 S.Ct. at 1806 n. 3 ("a defendant who knows he possesses a weapon with all of the characteristics that subject it to registration, but was unaware of the registration requirement ... may be convicted under § 5861(d)"); *accord, United States v. Mains,* 33 F.3d 1222, 1229 (10th Cir.1994) (in holding that the district court's jury instructions which required that the defendant have "knowingly possessed a shotgun with a barrel length of less than 18 inches or an overall length less than 26 inches" were consistent with *Staples,* the Tenth Circuit stated that the government was not required to prove that the defendant knew that such possession was illegal).

103 F.3d at 956. Although construing a different but closely related provision, *Owens* accurately and informatively applies *Staples* to an instance comparable to the one at hand. *Owens* confirms that the required mental state is knowledge of those essential attributes of the object that subject the object to the statute.

In this case, the knowledge required is only that this object is designed to shoot automatically, i.e., that it is a machine gun in the ordinary sense. A 7.5 millimeter Chatellerault 1924/29 is a French manufactured light machine gun, magazine fed, selective fire, and open bolt. The weapon is obviously the type that most adults (and adolescents) would recognize instantly as a machine gun. The weapon is, at least, designed to shoot automatically and clearly falls within the first sentence of Section 5845(b). The weapon is patently a machine gun in the ordinary sense.

At the rearraignment, Magistrate Judge Thomas G. Wilson, an experienced and highly skilled judicial officer, questioned

the defendant in accordance with Rule 11 of the Federal Rules of Criminal Procedure and developed a record replete with testimony about the items possessed by the defendant. For example, at the outset, Judge Wilson asked the defendant how he pled:

> THE COURT: Count 1 charges on or about August 24, 1996, at Wimauma, Hillsborough County, in the Middle District of Florida, Jose Luis Aguilar–Espinosa, defendant herein, did knowingly possess a firearm, that is, a machine gun as defined in Title 26, United States Code, Section 5845(b), more fully described as a Chatellerault, Model 1924/29, 7.5 millimeter caliber machine gun, Serial Number B–70552, which shoots and can readily be restored to shoot automatically more than one shot without manually reloading—without manual reloading by a single function of the trigger, in violation of Title 18, United States Code, Section 922(*o*).
>
> How do you plead to that charge; guilty or not guilty?
>
> THE DEFENDANT (Through the Interpreter): Guilty, because I had it, but I didn't know if it worked or didn't work.
>
> THE COURT: Did you know that it was a machine gun?
>
> THE DEFENDANT (Through the Interpreter): Yes, but I never knew if it could be repairable.
>
> THE COURT: Well, do you wish to plead guilty, or do you wish to plead not guilty?
>
> THE DEFENDANT (Through the Interpreter): Yes, guilty.

(T. p. 3, 1.20 through p. 4, 1.19).[4] In many respects, this answer was the clearest expression by the defendant. The defendant further testified as follows:

> THE COURT: Do you have any question about that charge?

4. "T" refers to the transcript of the January 16, 1998, rearraignment hearing before the Honorable Thomas G. Wilson, United States

Magistrate Judge, filed as "Document 35" in this Court.

**THE DEFENDANT** (Through the Interpreter): No. [T]he only thing is that I had it for the longest [time] and it was just in the closet.

(T. p. 14, 1.3–7).

**THE COURT:** All right. And they say that in the master bedroom they found a machine gun and they say that you knew that the weapon was a machine gun. Did you know—first, was there a machine gun there in your house?

**THE DEFENDANT** (Through the Interpreter): Yes.

**THE COURT:** And did you know that it was a machine gun?

**THE DEFENDANT** (Through the Interpreter): Yes, but I knew that it didn't work.

(T. p. 15, 1.12–20).

**THE COURT:** Where did you get it?

**THE DEFENDANT** (Through the Interpreter): At the flea market.

**THE COURT:** How long had you had it?

**THE DEFENDANT** (Through the Interpreter): About three to four years.

**THE COURT:** All right. Had you ever had any other parts that went with the part that you had?

**THE DEFENDANT** (Through the Interpreter): No.

**THE COURT:** All right. Now, from what you have described, meaning the box and the tube, it sounds to me like the frame and the receiver.

And I'm prepared to accept your plea of guilty, if that's what you wish to do. On the other hand, you may have a right to go to trial and argue that it wasn't a machine gun. You understand that?

**THE DEFENDANT** (Through the Interpreter): Yes.

**THE COURT:** And do you understand that by pleading guilty, you give up any right to complain in the future that what you had was not a machine gun?

**THE DEFENDANT** (Through the Interpreter): Yes.

(T. p. 17, 1.17 through p. 18, 1.12).

**THE COURT:** Did you know—did you know that the—if this weapon were fully—had all its parts, that it would be a machine gun?

**THE DEFENDANT** (Through the Interpreter): Yes.

(T. p. 18, 1.21–24).

**THE COURT:** Now, there is a factual basis, again, so I'm prepared to accept your plea of guilty if you wish to plead guilty. And if you plead guilty, you can never raise at some later time the claim that you didn't know that the serial number had been removed or obliterated. Do you understand that?

**THE DEFENDANT** (Through the Interpreter): Yes.

(T. p. 21, 1.7–13).

■ I have reviewed the testimony repeatedly, in its parts and as a whole. I retain no doubt or hesitation that the statute, as I understand it, is satisfied by the testimony elicited by the magistrate judge and that the defendant lawfully and sufficiently entered a plea of guilty with respect to the alleged offense under 26 U.S.C. § 5845(b) and 18 U.S.C. § 922(k). The weapon is a so-called National Firearms Act weapon and is listed among the artifacts included in the ATF's "Firearms Curios or Relics List" (available at www.atf.treas.gov./core/firearms/information/relics.htm), which specifies certain of the older weapons covered by the firearms statutes and regulations.

The defendant concededly purchased this firearm at a "flea market" and subsequently retained the firearm in his home, apparently in a closet for the most part, and believed, apparently accurately, that the firearm would not fire automatically (or, even, fire at all). I assume he did not know that it was readily restorable to automatic fire, and I again assume his ignorance of the firearms statute. However, he recognized that the weapon was the

type of weapon commonly understood and visually recognizable as a "machine gun," as that term is used ordinarily and without reference to the statutory definition. In other words, he understood that he had bought a machine gun, albeit an unworkable one, at the flea market. He understood and readily admits (and would be hard pressed to deny plausibly) that this weapon, inoperative or not, was precisely what he wanted—a machine gun for display, recreation, or mere pride of ownership. No matter. This defendant was in contravention of the statute at all times that he possessed this firearm, whether operative or inoperative, regardless of what he knew about the operability of the weapon. His testimony at the rearraignment leaves no doubt.

Often, scienter and *mens rea* are raised by defendants to challenge the firearm statute based on due process considerations arising from alleged ambiguity in the statute and the lack of sufficient knowledge by a defendant concerning the attributes of the pertinent weapon. *See, e.g., United States v. McCauley,* 601 F.2d 336 (8th Cir.1979), and cases collected at 133 A.L.R.Fed. 347, §§ 3–5. A disinterested review of the cases suggests a distinction that insulates Section 5845(b) from due process assaults and simultaneously ensures a satisfying element of scienter in all instances.

■ The first sentence of Section 5845(b) generally describes machine guns in the typical and ordinary sense. An adult with criminal capacity in possession of an "ordinary sense" machine gun obviously either knows or should know what he or she possesses. Based on common and shared experience, the law presumes that this person sufficiently understands the nature of the object to satisfy notions of due process. (As always, a plausible exception is conceivable but unlikely in the extreme.[5]) If an object shoots automatically, is designed to shoot automatically, or is readily restorable to shoot automatically, i.e., if an object is an "ordinary sense" machine gun, no knowledge other than knowledge that the weapon is possessed is necessary to convict (with one exception, discussed later). Knowledge of possession of an "ordinary sense" machine gun provides the necessary *mens rea.* The chance of an unjust result is so negligible that justice does not commend an attack based on vagueness, due process, or the like.

The second sentence of Section 5845(b) describes objects that generally are not machine guns in the "ordinary sense" but are nonetheless included by Congress in the definition as a means to extend the statutory reach to the desired degree, i.e., to encompass an item that is, as I have described it, an incipient machine gun, tantamount to a machine gun, or otherwise incorporating the imminent ability to fire automatically as a machine gun.

■ The items covered by the second sentence, but not the first sentence, are not necessarily readily recognizable as either a machine gun or a mischievous implement of any kind at all. They are only statutory machine guns. For example, a sere appears disarmingly innocent, but it is a statutory machine gun. If no scienter were required beyond mere knowledge of the possession of a sere, an entirely innocent person, with no concept of the nature and capacity of a sere, might capriciously fall within the statute. Concerns about vagueness and notions of due process rightfully appear in that instance. In my view, if an object is a "statutory" machine gun but not an "ordinary sense" machine gun, the government must prove the defendant knew the nature of the object as an object that is tantamount to, the precursor of, or conveys the automatic firing ability of, a machine gun. Proof under only the second sentence of Section 5845(b) is somewhat more demanding than proof under the first sentence. Because

---

**5.** Judge Marcus's discussion in *United States v. Ortiz,* 738 F.Supp. 1394 (S.D.Fla.1990), is apropos. Words are imperfect but necessary statutory constituents.

that is so, constitutional concerns are satisfied and the legislative intent is implemented—two agreeable results.

A comparison of *Staples, Owens,* and [*U.S. v. ]Rogers[, 94 F.3d 1519 (11th Cir. 1996)] suggests strongly the distinctive role played by the ability to recognize the pertinent weapon as an "ordinary sense" machine gun. After admitting the inherently suspect and threatening nature of a hand grenade and contrasting the widespread and wholesome uses for which normal firearms often are employed in this country, Justice Thomas in *Staples* states:

> The Government protests that guns, unlike food stamps, but like grenades and narcotics, are potentially harmful devices. Under this view, it seems that *Liparota*'s concern for criminalizing ostensibly innocuous conduct is inapplicable whenever an item is sufficiently dangerous—that is, dangerousness alone should alert an individual to probable regulation and justify treating a statute that regulates the dangerous device as dispensing with *mens rea.* But that an item is "dangerous," in some general sense, does not necessarily suggest, as the Government seems to assume, that it is not also entirely innocent. Even dangerous items can, in some cases, be so commonplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation. As suggested above, despite their potential for harm, guns generally can be owned in perfect innocence. *Of course, we might surely classify certain categories of guns-no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation—as items the ownership of which would have the same quasi-suspect character we attributed to owning hand grenades in Freed.* But precisely because guns falling outside those categories traditionally have been widely accepted as lawful possessions, their destructive potential, while perhaps even greater than that of some

items we would classify along with narcotics and hand grenades, cannot be said to put gun owners sufficiently on notice of the likelihood of regulation to justify interpreting § 5861(d) as not requiring proof of knowledge of a weapon's characteristics.

114 S.Ct. at 1800 (emphasis supplied).

*Staples* precisely acknowledges that possession of a machine gun as understood in the "ordinary sense" is sufficient to satisfy the *mens rea* requirement because of the obvious and worrisome nature of both the machine gun and the fact of possessing it. In contrast, *Staples* expresses concern for the innocent firearm owner who, for example, discovers by accident that a weapon manufactured and designed to operate semi-automatically has begun through wear and tear or misfortune to operate automatically due to no fault of, and outside of the knowledge of, the owner. 114 S.Ct. at 1802. Possessing a semi-automatic rifle purchased lawfully at a sporting store is hardly tantamount to harboring a machine gun. To punish one as if it were the other is nonsensical and contrary to notions of due process.

As explained, Section 5845(b) includes, as the first of the three elements in the first sentence, any weapon that "shoots" automatically. A formerly semi-automatic weapon that has become automatic is a machine gun within the first sentence but not an ordinary sense machine gun because a knowledgeable person perceiving a semi-automatic rifle or the like will not regard that weapon as an "ordinary sense" machine gun. Therefore, to convict that person under Section 922(k) and Section 5845(b), the prosecutor must prove the defendant's knowledge of the automatic capability of the otherwise semi-automatic weapon. Accordingly, with respect to a supposedly semi-automatic weapon that in fact will shoot automatically, the anticipated allowance exists. For example, in *Rogers,* the court reversed a conviction for possession of a weapon manufactured and designed as a semi-automat-

ic pistol, which was altered mechanically, but imperceptibly, to operate automatically. 94 F.3d at 1523, n. 6 and accompanying text. As the court stated:

> With limited exceptions, 18 U.S.C. § 922(*o*) makes it unlawful for an individual to possess a machinegun. In a consonant voice, the parties contend that Rogers's conviction under this subsection should be reversed due to insufficient evidence. We agree. The MAC–11 machinegun located in Rogers's truck had originally been manufactured as a semi-automatic pistol. Because the Government did not introduce any evidence showing that Rogers was aware that the MAC–11 had been altered to operate as a fully automatic weapon, his conviction on this count cannot stand. *See Staples,* 511 U.S. at [618–19], 114 S.Ct. at 1804.

94 F.3d at 1523. Because the MAC–11 pistol was not an "ordinary sense" machine gun and no *mens rea* was independently proven, the *mens rea* element remained unsatisfied and the conviction was reversed. A similar result would attach in the instance of any weapon manufactured and designed to operate semi-automatically, including the typical shotgun, rifle, or pistol that appears in the homes and among the possessions of innocent, law abiding citizens. To convict this owner of unlawful possession of a machine gun, the prosecution must prove knowledge by the owner of the characteristic of automatic fire. That knowledge is not necessary if, as in the instant case, the owner knows that he possesses a machine gun *qua* machine gun, i.e., an "ordinary sense" machine gun—an object that inevitably implies regulation and restriction by the government.

### 4. *The Obliterated Serial Numbers*

In *Rogers,* the court noted that *Staples* "applies with equal force to prosecutions under 18 U.S.C. § 922(*o*)." 94 F.3d at 1523, n. 5. I agree wholeheartedly. An explanation under Section 922(*o*) would proceed *pari passu* with the explanation under Sections 922(k) and 5845(b) that appears above. The result is the same.

### Conclusion

The defendant's motion to withdraw his plea under Sections 922(k) and 5845(b) and his motion to withdraw his plea under Section 922(*o*) are **DENIED** (Doc. 34). Both pleas were knowing and voluntary, which is established beyond reasoned doubt by the transcript of the rearraignment.